[Civ. No. 9506. First Appellate District, Division One.—March 14, 1938.]

AYAKO SAKUMA, Appellant, v. ZELLERBACH PAPER COMPANY (a Corporation) et al., Respondents.

Elmer P. Delany for Appellant.

Philip S. Ehrlich, Albert A. Axelrod and Clarence E. Todd for Respondents.

THE COURT.—A verdict in favor of the plaintiff having been rendered in this action the court, on motion of the defendants, entered judgment in their favor notwithstanding the verdict.

The action arose out of the publication of certain articles in the "Japanese American News", a newspaper printed in the Japanese language and circulated among Japanese people, the articles appearing on March 12, 14, 15 and 16, 1932. No question is raised as to the libelous character of the matter published, nor that the plaintiff is entitled to damages from the person or persons responsible for the publication, the question for consideration and decision here, as stated by the parties in their briefs, being whether there is any evidence sufficient to warrant a finding that the defendants, or any of them, are responsible therefor, either as owners or publishers of the newspaper, or under the doctrine of *respondeat superior*.

The "Japanese American News" was originally published by one K. Abiko. Abiko becoming financially involved, his property and business, including the newspaper and its operating equipment, were in September, 1931, by order of the superior court, placed in the hands of defendant William H. Marsh as receiver, the appointment of this gentleman being at the suggestion of defendant Zellerbach Paper Company, the principal creditor. Very shortly thereafter other creditors of Abiko instituted proceedings in the United States District Court to have him declared a bankrupt, and this was done, George K. Naus being appointed as receiver of the estate. As such receiver he continued publication of the newspaper, and retained defendant Marsh as its business manager. Thereafter Zellerbach Paper Company, through its

attorney Philip S. Ehrlich, entered into negotiations with the receiver through the latter's attorney, R. G. Hunt, for the acquisition of the newspaper, and apparently agreed upon terms which the receiver would be willing to recommend to the court for its sale. These terms were embodied in a written offer by the paper company, and the property to be acquired included, among other things, "machinery, equipment, accounts receivable, cash on hand, including also all assets of the newspaper now being published by said George K. Naus". The written offer was quite lengthy, and the last two paragraphs thereof were in the following terms:

"13. The undersigned shall receive all surplus cash on hand after all bills incurred by the said bankrupt receiver in the operation of the said newspaper have been paid; and if it shall appear that there is not sufficient cash on hand to pay such bills the receiver may make up such deficiency by retaining such portion of the accounts receivable as may be necessary to provide cash to liquidate such deficiency.

"14. The payment of the purchase price hereunder shall be subject to receipt by purchaser of a good and sufficient title to said assets, and this offer to purchase is conditioned upon an order of this court confirming said offer to purchase without modification, and upon said order, if made, becoming final."

The proposed sale was submitted to the District Court, which on March 7, 1932, made an order in writing, accepting the offer according to its terms and authorizing and confirming the proposed sale. The language of the order in that behalf is:

"Now, therefore, it is hereby ordered that the offer of the Zellerbach Paper Company to purchase those assets of the estate of K. Abiko, an alleged bankrupt, as said assets are described in the offer of said Zellerbach Paper Company attached to the return of said proposed sale and also hereto, be, and the same is hereby accepted, and that the proposed sale in accordance with said offer be, and the same is hereby confirmed.

"And it is hereby further ordered that said George M. Naus, as receiver in bankruptcy of the estate of K. Abiko, an alleged bankrupt, be, and he is hereby, authorized and directed to execute and deliver to the said Zellerbach Paper Company, upon receipt of the purchase price, a bill of sale,

and/or other good, proper and sufficient instrument of title to the said property so sold and/or proposed to be sold.''

The newspaper being a going concern, with claims accruing, expenses being incurred and the amount of bills receivable changing daily, it was necessary for the attorneys for the paper company and the receiver to fix a date upon which the bill of sale would be made and the amount of cash in the receiver's hands and bills receivable be determined, and for that purpose March 18th was selected; and it was found that on that date the amount of cash in the hands of the receiver to be paid over to the Zellerbach Paper Company was the sum of $1721.60. The attorneys, however, were not ready to complete the transaction on that day, the form which payment to the receiver for the property was to take requiring the preparation of numerous documents, such as agreements on the part of third parties, proof of labor claims, waivers and withdrawals, etc. On March 26th, as a step in the completion of the transaction the paper company's attorney addressed to and delivered to the receiver a letter and various annexed documents, the letter containing a statement to the effect that ''You are to hold the foregoing documents in escrow subject to the performance of the order of the United States District Court for the Northern District of California in the Matter of K. Abiko, Bankrupt, No. 21,135K, made on the 7th day of March, 1932, in which order the offer of Zellerbach Paper Company to purchase the assets of the estate of K. Abiko was confirmed; and you are hereby requested to execute the bill of sale hereto attached, or other good, sufficient and proper instrument of title to the property sold or proposed to be sold as of March 18, 1932, as set forth in said order. . . . Upon your delivery to me of the documents requested as hereinabove set forth, you may file, record or otherwise make use of, the documents handed to you; and the Zellerbach Paper Company agrees that in the event there has been any indebtedness incurred by you as receiver in the estate of K. Abiko in the operation of the newspaper owned by said estate, to wit, the Japanese American News of San Francisco recourse may be had to the accounts receivable transferred by you to the Zellerbach Paper Company for the payment of such indebtedness. Upon the full consummation of this transaction the Zellerbach Paper Company will cause to be filed in the office

of the Recorder of the city and county of San Francisco a satisfaction of the chattel mortgage now existing upon the portion of the property being transferred to it under the aforesaid order of court.''

This letter was formally accepted by the receiver through his attorney as carrying out the terms of the sale.

Following the delivery of this letter and documents and on March 28, 1932, the bill of sale dated March 18, 1932, was delivered to the Zellerbach Paper Company.

As this company intended not itself to operate the newspaper but to cause a corporation to be formed for that purpose, it had had prepared a bill of sale from itself to J. C. McCrary and Albert A. Axelrod of the same assets or property so transferred to it, and bearing the same date as the receiver's bill of sale, namely, March 18, 1932. This bill of sale was likewise delivered on the 28th day of March; and thereafter McCrary and Axelrod commenced the operation of said newspaper and continued such operation until the defendant Japanese American News Publishing Co. was organized, when, on June 22, 1932, they transferred said property and assets to that corporation by bill of sale of that date.

As already stated, the libelous articles were published on March 12th, 14th, 15th and 16th. On March 15, 1932, Marsh, the business manager of the newspaper, following his usual custom, prepared and sent to receiver Naus for signature a number of checks for the purpose of paying wages, salaries and other expenses of the paper for a period of time commencing at a date prior to March 7th and extending to the date of the checks. These Naus refused to sign, taking the position for the first time that the interest of the bankrupt estate in the ''Japanese American News'' ceased upon the making of the order of sale of March 7th. Accordingly Marsh prepared other checks in amounts sufficient to pay such expenses up to March 7th; and on March 16th or 17th and thereafter deposited all moneys received in a bank account which he opened in his own name as trustee; and when later the bill of sale to McCrary and Axelrod was delivered to them the balance in this account was turned over to them and went to swell the funds and assets received by them under such bill of sale, and it was from this account that the expenses just mentioned were ultimately paid. Up to

the time of the receipt by it of its bill of sale by the trustee on March 28th no action of any kind was taken by the Zellerbach Paper Company or its agents to take over the newspaper plant or other assets, or in any way to operate or control the business, nor is there any evidence of any tender thereof to it by the receiver.

In support of her appeal the plaintiff urges that the trial court erred in rendering judgment for the defendants since there was sufficient evidence to warrant a finding implied by the jury's verdict that title to the ''Japanese American News'' passed to the Zellerbach Paper Company on March 7, 1932, and that such company as owner, and the other defendants as agents and employees, were operating the paper on the dates of publication of the libels.

■ The parties are in accord upon the legal proposition that in considering the evidence to determine whether a motion for judgment notwithstanding the verdict should have been granted all conflicts must be disregarded, and the evidence must be viewed in the light most favorable to the one in whose favor the verdict of the jury was rendered; and that, on the other hand, if in applying the foregoing rule the result is a determination that there is not evidence of sufficient substantiality to support a verdict in his favor the judgment notwithstanding the verdict should be affirmed. (*Estate of Flood*, 217 Cal. 763 [21 Pac. (2d) 579]; *Estate of Caspar*, 172 Cal. 147 [155 Pac. 631].) In this behalf the appellant contends that as matter of law title to the newspaper passed to the paper company by the confirmation of sale on March 7th, and, further, that certain evidence which was admitted shows this to have been the intention of the parties to the sale.

■ As establishing the first phase of its contention the appellant cites cases holding that in a judicial sale title does not pass until confirmation by the court. It does not follow, however, from the fact that the purchaser acquires no title until confirmation that he does so upon confirmation in every case. In a judicial sale the court is the vendor (*In re Maloney*, 21 A. B. R. 502; *In re Jungmann*, 186 Fed. 302 [108 C. C. A. 380, 26 A. B. R. 401]), but the sale is, nevertheless, a contract, it being the result of an offer on the one part and its acceptance upon the other. Where the sale is made by written offer and an acceptance in writing, the

intention of the parties as to when title shall pass is to be gathered from those writings, and those alone, in the absence of any ambiguity therein.

. ■ The present sale was effected by the written offer of the Zellerbach Paper Company, recommended for acceptance by the receiver, and accepted by the court in its so-called confirmation of sale. Such offer and acceptance by confirmation must govern as to when title passed.

It will have been seen from the quotations we have made from the written offer and confirmation of sale that their effect is to clearly provide that the receiver should not transfer title to the property until payment therefor, and on the other hand, the purchaser was not required to pay except upon receipt of an instrument transferring title. As we have seen, payment and delivery of the bill of sale were made on March 28th, twelve days after publication of the last of the libelous articles. As is said in *Cropper* v. *Brown*, 76 N. J. Eq. 406 [74 Atl. 987, 139 Am. St. Rep. 770], the legal title does not vest in the purchaser at a judicial sale until the delivery of the deed, although in the meantime the property is held in trust for him, and the beneficial ownership of the property is vested in him, so that any increase or decrease in value inures to him. Conceding that between confirmation of sale and delivery of the bill of sale the purchaser is the equitable owner, we know of no principle of law which imposes upon such equitable owner liability for a tort committed by the legal owner in possession.

On the question of what evidence the record discloses in support of the jury's implied finding that the Zellerbach Paper Company became the owner of the "Japanese American News" upon confirmation of the sale, the appellant makes no claim that upon the making of the order of confirmation the receiver, either actually or symbolically, turned over to said defendant the newspaper plant or its management, but points to certain items of evidence as tending to prove that the Zellerbach Paper Company and the receiver "understood that title was transferred" upon the making of that order.

Passing the point that evidence of the circumstances under which a contract is entered into, or as to the contemporaneous construction placed upon it by the parties, is admissible only when the contract is ambiguous—which we have seen is not the case here—the appellant directs attention to the follow-

ing circumstances disclosed by the record: that the appointment of William H. Marsh as receiver in the proceeding in the state court was at the suggestion of Zellerbach Paper Company; that upon the appointment by the United States District Court of George M. Naus as receiver he retained Marsh in his employ as manager of the newspaper; that the salaries of the employees of the paper were paid by Naus only up to March 7th; that their salaries were thereafter paid from an account known as "A. A. Axelrod and J. C. McCrary, dba Japanese American News"; that Axelrod was an attorney in the employ of Philip S. Ehrlich, attorney and general counsel for the paper company, and McCrary was an employee of that company; that neither of these two individuals had any proprietary interest in the paper; that the paper company, upon receipt of the bill of sale from the receiver, executed to them a bill of sale of the same property and assets, and they subsequently and without consideration therefor transferred those assets to a corporation organized by the paper company; that the paper company, upon receiving from the receiver the check for the balance of money in his hands on March 28, 1932, as part of the assets purchased by it from the bankrupt estate, endorsed the check to McCrary and Axelrod; that funds collected by Marsh after March 15th, when the receiver refused to sign checks for any expenses accruing after March 7th, were placed by him in a bank account opened in the name of "Japanese American News, William H. Marsh, Trustee", and subsequently, after McCrary and Axelrod received their bill of sale, the balance in said account was, on the advice of Ehrlich, transferred to the McCrary-Axelrod account, and that it was from this account that wages and salaries for services rendered the paper subsequent to March 7th were paid; that during the period following March 7th, Marsh, managing and conducting the operations of the paper, had conversations with Ehrlich with respect to the operation and control of the paper, the details or substance of the conversations, however, not appearing; and that the method of handling the funds of the paper pending the organization of a corporation to take it over and operate it was evolved by Ehrlich and Axelrod.

Viewing these items of testimony in the light of such other parts of the record as are not contradicted, it is clear

that before acquiring the "Japanese American News" from the bankrupt estate the defendant paper company had determined to cause a corporation to be formed for the purpose of taking it over and conducting it, and that it arranged with McCrary and Axelrod to hold and operate the paper during the interval of time between its acquisition and such formation, and that these, in so doing, were its agents; that the payment by these agents of expenses incurred in conducting the newspaper after March 7th and remaining unpaid at the time of the transfer of the assets of the bankrupt estate, was made from funds received from the receiver ($1721.60) under the terms of the sale, to which was added amounts collected by Marsh, the business manager of the paper, after the receiver's refusal on March 15th to sign the pay-roll checks, and was in consonance with the terms of sale and an understanding arrived at between the attorneys for the receiver and the paper company in order to facilitate the closing of the transaction; that it made no difference to the paper company whether it, through its agents, paid these particular expenses, since they were paid out of funds received from the receiver and from Marsh collected by him before the transfer of the property to it, which funds, had these expenses been paid by the receiver, would have been correspondingly diminished; that the drawing by Marsh of the pay-roll checks on March 15th and their presentation to the receiver for signature was in the course of his duties as manager for the receiver, and that the refusal of the latter to sign those checks occurred after the publication of three out of four of the libelous articles and was the first intimation given by the receiver that he considered that title to the assets of the bankrupt to have passed to the paper company, and that such refusal was self-serving in character.

There is surely nothing in any of these circumstances nor in all combined to warrant an inference therefrom that the receiver, acting as the officer of the court, or the paper company intended—even if evidence of intention were admissible in evidence—that title should pass on March 7th, the date of the confirmation of sale.

█ For the purpose of proving that title from the receiver to the paper company did in fact pass upon such confirmation the plaintiff offered in evidence an order made by the United States District Court in the matter of the

bankrupt estate some seven months after the sale. It is entitled "Order allowing second account of receiver and enjoining prosecution of suit," and is dated October 24, 1932.

The occasion for the making of the order was that the present action had originally been brought against George M. Naus, as receiver of the bankrupt estate, and in the course of the proceedings in bankruptcy Naus petitioned the District Court for an order enjoining the prosecution of the suit. The record contains no evidence that any notice of the proceedings was given to any of the defendants, although there is a recital in the order that "due notice of the hearing of said account and of the application of the receiver and of counsel for compensation" had been given to the creditors by mail.

The admission in evidence of the order was objected to as irrelevant, incompetent and immaterial, not binding on the defendants, and upon several other grounds. The purpose of the offer, as stated by the attorneys for the plaintiff, was to prove transfer of title of the newspaper on March 7, 1932, and that it was offered under the provisions of subdivision 1 of section 1908 of the Code of Civil Procedure.

The pertinent part of that section reads: "Effect of a judgment upon rights in various cases. . . . (1) In case of an order against a specific thing, or in respect to the probate of a will, or the administration of the estate of a decedent, or in respect to the personal, political or legal condition or relation of a particular person, the judgment or order is conclusive upon the title to the thing, the will, or administration, or the condition or relation of the person."

The order, among other things, contained the following language: "That the bankrupt estate and the said receiver in bankruptcy were not the owners of the said newspaper after March 7, 1932, and that the said newspaper was not operated or published by the said bankrupt estate or the said receiver in bankruptcy after March 7, 1932, and the said receiver did not conduct the bankrupt's business after March 7, 1932."

In arguing that the said order was admissible plaintiff's attorneys contended that the finding is of a legal condition or relation as designated in the above-quoted subsection.

In the first place, there being, as we have already pointed out, no ambiguity in the contract of sale as evidenced by the written offer and acceptance, the order was not admissible

to show the intention of the parties on the question when title to the property passed.

In the second place, it seems very obvious that the order was not an adjudication *in rem*. It was not an adjudication of a personal, political or legal condition or relation. Naus, it is conceded, was receiver in bankruptcy for the estate both before and after March 7, 1932, and was such when this particular order was made. The issue before the District Court was not the status of Naus or his relation to the bankrupt estate. The issue was whether at a particular date certain property formed part of its assets, and the determination of this question one way or the other would not affect the status of the receiver or his relation to the estate. He was receiver for the entire estate or he was not receiver at all. The adjudication was merely that after a given date certain personal property no longer formed part of the assets of the bankrupt. It was, of course, conclusive ''between the parties and their successors in interest by title subsequent to the commencement of the action or special proceeding'' (Code Civ. Proc., sec. 1908, subd. 2); but here, as we have seen, the title of Zellerbach Paper Company was acquired before the commencement of the proceeding by the receiver to enjoin prosecution of the suit for libel in the state court. If this contention of the appellant were valid it would follow that if the executor of an estate, for example, should prosecute a suit to quiet title to its real estate against a particular individual the judgment therein would bind all the world instead of only those persons coming within the terms of subdivision 2 of said code section, and this simply because the plaintiff in the suit was the executor of an estate. It must be manifest that subdivision 1 of the section refers to the status or relationship in itself or in its entirety, and not to any action taken by the person occupying the status or relation. On this question we quote from 2 Freeman on Judgments, section 900, page 1894: ''Any proceeding which is designed or the primary purpose of which is to establish status is to that extent a proceeding *in rem* and the judgment or decree, if upon the merits, is as conclusive as any other judgment *in rem*. But where the action or proceeding is such that a particular status, though directly in issue is only incidentally involved, or, in other words, is merely one of the facts the determination of which is essential to

the adjudication of the principal subject-matter of the litigation, the resulting judgment is *res judicata* as to that status only as a judgment *in personam*, subject to all the limitations governing the operation of such judgments as *res judicata*, and, if conclusive, binds only the parties and privies or other persons who may be concluded by such an adjudication.''

There is another reason, as pointed out in respondents' brief, why the order was not admissible, which is, that that part of it enjoining the prosecution of the suit in the state court (the only portion of the order with which we are here concerned) was void for lack of authority on the part of the District Court to make it, the action being one for a tort charged against the receiver. (*Gableman* v. *Peoria etc. R. Co.*, 179 U. S. 335, 338 [21 Sup. Ct. 171, 45 L. Ed. 220]; *Smith* v. *Jones Lumber & Mercantile Co.*, 200 Fed. 647, 650.) This order being, first void, and second, not binding on the defendants, could add no probative force to the other evidence introduced by the plaintiff hereinbefore reviewed.

While, perhaps, adding nothing to what has been said, we may observe that the trial court in admitting this order stated that in its opinion it was not binding on defendants, but nevertheless admitted it ''for what it is worth''.

What we have said hitherto bears more particularly upon the question of the ownership of the ''Japanese American News'' on the dates when the libelous articles were published. This question does not affect the liability sought to be imposed upon defendant Marsh since he admittedly was business manager of the newspaper at the time of such publication, so that liability on his part, if any, must be predicated upon his own direct participation therein.

There is no testimony in the record as to this defendant's duties: the testimony is confined to the bare fact that he was business manager. It is not shown that his authority included any control over the editorial staff; and the word ''business'' being prefixed to ''manager'' would indicate that it did not. The most that may be said as to his participation in the publication of the alleged libel is that he was directly concerned in the distribution of the newspaper.

The newspaper, we have seen, was printed and published in the Japanese language, which, it is conceded, Marsh did

not understand. It was also testified and not disputed that he had no knowledge of the preparation or contents of the articles until after publication. Under these circumstances it would seem that the rule stated in 37 Corpus Juris, Libel and Slander, section 307, page 15, would be applicable, namely, "It is a good defense for the vendor or distributor of a newspaper or periodical to show that he had no knowledge of the libelous matter, and that there were no extraneous facts which should have put him on his guard."

It results from what we have said that the record discloses no substantial legal evidence sufficient to support a judgment in favor of the plaintiff, for which reason there was no error on the part of the trial court in rendering judgment for the defendants notwithstanding the verdict.

The judgment is affirmed.