[Civ. No. 67926. Second Dist., Div. Three. Mar. 28, 1984.]

KENNETH OSMOND, Plaintiff and Appellant, v.
EWAP, INC., Defendant and Respondent.

Counsel

Jack Diamond for Plaintiff and Appellant.

Brown, Weston & Sarno, David M. Brown and G. Randall Garrou for Defendant and Respondent.

Opinion

**ARABIAN, J.—**

### Introduction

 This is an appeal by plaintiff Kenneth Osmond (Osmond) from the judgment dismissing his action[1] after the trial court grant-

---

[1]Osmond purports to appeal from a July 6, 1982, "Judgment of Dismissal" entered upon the trial court's grant on June 11, 1982, of EWAP's motion for summary judgment. However, inasmuch as the purported judgment of dismissal only disposed of the first cause of action of Osmond's three count complaint, it is not a complete and final judgment and an appeal from it is barred by the "one final judgment rule." (*Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920-921 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]; *Tenhet* v. *Boswell* (1976) 18 Cal.3d 150, 153-154 [133 Cal.Rptr. 10, 554 P.2d 330].) Rather than dismiss this appeal, however, in the interest of justice and to prevent unnecessary delay, we order that the judgment of July 6, 1982, be amended to recite that the summary judgment pertained only to EWAP's first cause of action and to add thereto a paragraph dismissing the second and third causes of action based on the trial court order of January 22, 1982, granting without leave to amend EWAP's motion for judgment on the pleadings as to those counts. (*Ibid.*) Such a procedure is appropriate where, as here, the superior court file shows that the trial court failed to dispose of all causes of action as a result of inadvertence or mistake, rather than an intention to retain the remaining causes of action for trial. (*Ibid.*, see also *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 289, fn. 1 [142 Cal.Rptr. 429, 572 P.2d 43]; *Oakes* v. *Suelynn Corp.* (1972) 24 Cal.App.3d 271, 280-281 [100 Cal.Rptr. 838]; *Gombos* v. *Ashe* (1958) 158 Cal.App.2d 517, 524 [322 P.2d 933]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 49, 50, pp. 4064-4065.)

ed respondent EWAP, Inc.'s (EWAP)[2] motion for summary judgment as to Osmond's first cause of action for libel. We affirm the judgment on the ground that Osmond failed to raise a triable issue on the question of malice, an element of libel which must be proved to impose liability on a distributor which merely disseminates libelous material published by others.[3]

### STATEMENT OF FACTS

Osmond's complaint and his declarations submitted in opposition to EWAP's motion for summary judgment set forth the following facts relevant to this appeal:

Osmond was the child actor who in the 1950's portrayed the character "Eddie Haskell" in the popular television series, "Leave it to Beaver." Osmond was the only actor who ever played that character.

EWAP operated a chain of retail "adult book stores" under the name Le Sex Shoppe. One or more of the stores prominently displayed in large glass showcases, for sale to the public, the "Playmate" series film "Supercock." The label on the film carton showed a photograph of a man and woman engaged in a lewd sex act. The legend on the label stated that the male star of the film was "John Holmes, who played 'Little Eddie Haskell on the Leave it to Beaver' show . . . ."

At the time the film was thus displayed and sold by Le Sex Shoppe stores, Osmond was a man in his mid-thirties, married, the father of two children and a police officer with the Los Angeles Police Department. When it was brought to Osmond's attention that the film was being sold in Le Sex Shoppe stores, he visited the stores and saw the film on display for sale to the public.

Osmond's friend, Officer Lane, of the Los Angeles Police Department, who was aware that the statement on the film carton was false, also visited a Le Sex Shoppe store. Officer Lane spoke with a store clerk about the film "Supercock" and its advertisement that John Holmes had played "Little Eddie Haskell." The clerk told Lane that the store also carried pornographic films made by other "stars" before "going into the movies."

Osmond alleged in his complaint that the libel was "published by the defendants and each of them, with malice, knowing that the same was false or with reckless disregard whether it was false or not . . . ."

---

[2] EWAP, Inc. is also known as Erotic Words and Pictures, Inc.

[3] All of the other defendants, including the alleged publishers of the defamation, were either dismissed from the action or were not served with the complaint.

EWAP's motion for summary judgment was supported by declarations, as well as by interrogatories EWAP had propounded to Osmond and Osmond's answers thereto. EWAP's motion was made on the grounds, inter alia, that Osmond could not raise a triable issue of fact on the issue of malice. EWAP posited that malice is an essential element of Osmond's cause of action for libel for two reasons: (1) because he is a public figure and (2) because EWAP is a distributor which merely disseminated the libelous material published by others.

The declarations EWAP submitted in support of its motion for summary judgment were by Howard Green and Melvin Starkman, the president and vice president of EWAP, respectively. Each of these officers stated that EWAP's business activities consisted of buying films from publishers or producers for distribution in the Los Angeles area and for sale in bookstores operated by EWAP. EWAP was not the publisher of any of the merchandise it distributed.

During the time relevant here, only Green and Starkman had authority to order merchandise for EWAP. The merchandise was ordered for resale in two ways. Each week EWAP's wholesalers automatically delivered items directly to EWAP stores; some new items as well as a second or third series of the same items were delivered. Other merchandise was purchased for resale by telephone, delivered to EWAP's warehouse and thereafter transferred to EWAP's stores. The officers of EWAP did not see the merchandise delivered directly to its stores nor the merchandise delivered to its warehouse.

During the relevant period, EWAP had 10,000 to 15,000 films in its inventory. The records of EWAP's purchases consist of EWAP check vouchers and supplier invoices which describe only the number of units purchased and do not describe the films by name. Although EWAP did carry some of the "Playmate" series films many years ago, neither Green nor Starkman recalled which films in the series were carried and the purchase and sales records of EWAP do not indicate titles of specific films. Further, EWAP has no record of purchases made directly from "Playmate" films nor from "Starlight Enterprises," which were also named defendants in this lawsuit.

Before reading the complaint in this case, neither Green nor Starkman had ever heard of Kenneth Osmond and did not know who he was or who had played the role of "Little Eddie Haskell" on "Leave it to Beaver." Neither Green nor Starkman recalled ever seeing the carton or the brochure for the film "Supercock," both of which contained the libelous material.

As noted above, in addition to the declarations of Green and Starkman, EWAP also submitted in support of its motion for summary judgment inter-

rogatories propounded by EWAP to Osmond and Osmond's answers thereto. Osmond's answers revealed that although Osmond had purchased two films to introduce in evidence at trial against EWAP, Osmond was not aware of any statement by any officer, employee, or agent of EWAP which showed EWAP had knowledge prior to the sale of the two films that (1) the film carton was present in the bookstores, (2) the carton contained the defamatory statement or (3) the statements were false or if EWAP did not know the statements were false, EWAP entertained serious doubts whether the statements were true.

The trial court granted EWAP's motion for summary judgment on the grounds that the action had no merit and that Osmond presented no triable issue of material fact. Judgment was entered thereon and this appeal followed.

## CONTENTIONS

Osmond contends that EWAP's motion for summary judgment as to his first cause of action for libel was improperly granted for the following reasons:

1. The declarations in support of the motion were defective because the declarants failed to state that the matters to which they referred were within their personal knowledge and failed to discuss whether they were competent to testify regarding these matters. (Code Civ. Proc., § 437c.)

2. Osmond raised a triable issue on the question of malice by presenting evidence that EWAP either knew of the libelous nature of the statement on the film carton or was aware of facts which imposed a duty to investigate.

3. Osmond was not a public figure for purposes of this action and therefore he was not required to prove malice.

a. Osmond attained anonymity and lost his public figure status with the passage of time.

4. EWAP waived its public figure "defense" by failing to raise the issue in its answer.

5. Issues regarding First Amendment rights and statute of limitations defenses are not proper grounds for summary judgment.

## DISCUSSION

### I.

*Standard of Review.*

Inasmuch as this case reaches this court on appeal from a summary judgment in favor of the defendant, EWAP, it is only necessary for us to determine whether there is any *possibility* Osmond may be able to establish his case. (*Tresmer* v. *Barke* (1978) 86 Cal.App.3d 656, 661-662 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]; *Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Terelink & Bell* (1977) 70 Cal.App.3d 331, 338-339 [138 Cal.Rptr. 670].) Summary judgment is properly granted where the evidence in support of the moving party conclusively negates a necessary element of the plaintiff's case or establishes a complete defense and thus demonstrates that under no hypothesis whatever is there a material factual issue which requires the process of a trial. (*Ibid.*, accord *Sprecher* v. *Adamson* (1981) 30 Cal.3d 358, 362 [178 Cal.Rptr. 783, 636 P.2d 1121].) In making its determination, the trial court may rely on "affidavits, declarations, admissions, answers to interrogatories, depositions and matters of which judicial notice . . . may be taken." (Code Civ. Proc. § 437c, subd. (b); *Barrett* v. *Atlas Powder Co.* (1978) 86 Cal.App.3d 560, 563 [150 Cal.Rptr. 339]; see *Sheffield* v. *Eli Lilly & Co.* (1983) 144 Cal.App.3d 583, 611 [192 Cal.Rptr. 870].) The party opposing the motion for summary judgment supported by such affidavits, declarations, answers to interrogatories, or other documents sufficient to sustain the motion, has the burden of showing that triable issues of fact exist. (*Ibid.*; *Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) "The purpose of the summary procedure is to penetrate through evasive language and, adept pleading and ascertain the existence or absence of triable issues." (*Chern* v. *Bank of America, supra,* at p. 873.)

### II.

*The Declarations Submitted by EWAP in Support of Its Motion for Summary Judgment were Not Defective.*

First, we dispose of Osmond's contention that the declarations of Green and Starkman in support of EWAP's motion for summary judgment were defective because each declarant failed to discuss his competence to testify regarding the facts set forth in his declaration.

The requirement of the law in this respect appears in Code of Civil Procedure, section 437c, subdivision (d) as follows: "Supporting and opposing

affidavits or declarations shall be made by any person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

In *Roy Brothers Drilling Co.* v. *Jones* (1981) 123 Cal.App.3d 175 [176 Cal.Rptr. 449], the appellant made the identical challenge which Osmond makes here to declarations submitted by the respondent in support of its motion for summary judgment. In that case this very court stated: "The requirement of this section is not that the declarant recite the conclusion that he can competently testify but that he allege facts showing his competence." (*Id.*, at p. 182.)

The declarations of Green and Starkman, which are virtually identical, show clearly that each man was competent to testify regarding his own state of mind, namely, whether he did or did not have knowledge of the defamatory content of the statement on the film carton and whether he was or was not aware of any facts which imposed a duty to investigate. Thus, the declarations established that neither Green nor Starkman had ever heard of Osmond nor knew who had played the part of "Little Eddie Haskell" on the "Leave it to Beaver" series. Further, the declarations established that neither of them had ever seen the film cartons which contained the libelous statement.

Moreover, Green and Starkman, as president and vice president of EWAP, respectively, were the only persons with authority to order merchandise for EWAP stores and, as such, each of them had personal knowledge of EWAP's purchase and resale methodology and documentation. Certainly, by virtue of their positions and described duties, both Green and Starkman were competent to testify regarding the vast quantities of film in EWAP's inventory which precluded knowledge of individual films, and were equally competent to testify that EWAP was not the publisher of any of the merchandise it distributed.

In sum, the declarations were sufficient to establish that they were made on personal knowledge and showed affirmatively that the declarants were competent to testify to the matters stated therein even though the declarations contained no statement that "'the facts set forth are personally known to the declarant and . . . he has firsthand knowledge of the same.'" (*Id.*, at p. 181.)

### III.

*Osmond Did Not Raise a Triable Issue on the Question of Malice.*

We turn now to the question whether, absent malice, civil liability may be imposed on a retail distributor of pornographic materials, such as EWAP, which merely disseminated or circulated another's libel.

There is no California case which is directly on point. However, in *Lewis v. Time Inc.* (E.D. Cal. 1979) 83 F.R.D. 455, affd. (9th Cir. 1983) 710 F.2d 549), the district court held that under California law, a plaintiff seeking to impose liability on a news and magazine distributor for a libel which appeared in a national magazine must prove that the distributor either knew of the libelous content of the article or that facts were known which imposed a duty to investigate. (*Id.*, at p. 464.) We agree with the conclusion of the *Lewis* Court. We hold that the requirement of scienter or "actual malice" applies with equal force to this case, where the defendant, EWAP, is a distributor of pornographic materials and the libelous statement appeared on the carton of a pornographic film sold in "adult" bookstores operated by EWAP.

■ The general rule for defamation is that everyone who takes a *responsible* part in the publication is liable for the defamation. (*Jones* v. *Calder* (1983) 138 Cal.App.3d 128, 134 [187 Cal.Rptr. 825]; *McGuire* v. *Brightman* (1978) 79 Cal.App.3d 776, 789 [145 Cal.Rptr. 256].) Thus, a "business manager" of a foreign newspaper is not liable where the newspaper was published in a language he did not understand and he had no control over the editorial staff and no knowledge of the preparation or content of the articles until after publication. (*Sakuma* v. *Zellerbach Paper Co.* (1938) 25 Cal.App.2d 309, 321-322 [77 P.2d 313].) ■ And, the author of an originally nondefamatory statement is not responsible for modifications or alterations, made without his knowledge, which make the statement libelous. (*Montandon* v. *Cox Broadcasting Corp.* (1975) 45 Cal.App.3d 932, 935-937 [120 Cal.Rptr. 196].)

■ One who merely plays a secondary role in disseminating information published by another, as in the case of libraries, news vendors, or carriers, may avoid liability by showing there was no reason to believe it to be a libel. (Prosser, Law of Torts (4th ed. 1971) § 113, p. 775.) It is, therefore, a good defense for a mere vendor or distributor of a newspaper or other periodical to show that he had no knowledge of the libelous matter and that there were no extraneous facts which should have put him on guard. (6 Cal.Jur.3d., Assault and Other Willful Torts, § 187, pp. 394-395.) In short, innocence is generally considered a defense where such defendants merely circulate another's libel unless "they knew or should have known" of the defamatory nature of the material. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 316, p. 2585; Sack, Libel, Slander, and Related Problems (1980) § II.6.1, p. 88.)

We believe section 581 of the Restatement Second of Torts is a good formulation of the law pertaining to vendors or distributors of defamatory material: "[O]ne who only delivers or transmits defamatory matter pub-

lished by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character." This rule protects libraries and vendors of books, magazines and newspapers. (*Church etc.* v. *Minnesota State Med. Ass'n.* (1978) 264 N.W.2d 152; *Hartman* v. *American News Co.* (7th Cir. 1948) 171 F.2d 581, *cert. den.* (1949) 337 U.S. 907 [93 L.Ed.2d 1719, 69 S.Ct. 1049]; *Balabanoff* v. *Fossani* (1948) 192 Misc. 615 [81 N.Y.S.2d 732].) In *Lerman* v. *Chuckleberry Pub., Inc.* (S.D.N.Y. 1981) 521 F.Supp. 228, 235, the District Court noted that this has long been the rule in New York.

Comment (e) to section 581 of the Restatement Second of Torts explains: "Bookshops and circulating or lending libraries come within the rule stated in this Section. The vendor or lender is not liable, if there are no facts or circumstances known to him which would suggest to him, as a reasonable man, that a particular book contains matter which upon inspection, he would recognize as defamatory. Thus, when the books of a reputable author or the publications of a reputable publishing house are offered for sale, rent or free circulation, he is not required to examine them to discover whether they contain anything of a defamatory character. If, however, a particular author or a particular publisher has frequently published notoriously sensational or scandalous books, a shop or library that offers to the public such literature may take the risk of becoming liable to any one who may be defamed by them."

Clearly, a bookstore which sells or rents films as well as books also comes within the rule stated in section 581. The real question, however, is whether "adult" bookstores, which distribute sexually explicit films and books, are also governed by the rule.

■■ In the context of cases dealing with permissive regulation, the courts have uniformly held that the activity of selling or distributing books is entitled to First Amendment protection. (*Smith* v. *California* (1959) 361 U.S. 147, 150 [4 L.Ed.2d 205, 209, 80 S.Ct. 215]; *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 661 [97 Cal.Rptr. 320, 488 P.2d 648]; *Ebel* v. *City of Garden Grove* (1981) 120 Cal.App.3d 399, 406 [176 Cal.Rptr. 312].) The operation of a picture arcade is also activity protected by the First Amendment. (*People* v. *Glaze* (1980) 27 Cal.3d 841, 846 [166 Cal.Rptr. 859, 614 P.2d 291]; *EWAP, Inc.* v. *City of Los Angeles* (1979) 97 Cal.App.3d 179, 184 [158 Cal.Rptr. 579]; *People* v. *Perrine* (1975) 47 Cal.App.3d 252, 257 [120 Cal.Rptr. 640].) "The fact that a picture arcade is a profit oriented-business [citations] or that it may exhibit pictures which are offensive or lacking in social worth is not relevant. [Citations.]" (*People* v. *Glaze, supra,* at p. 846.) ■■ Likewise, "adult" bookstores which sell "adult" books, magazines, and films and other "things" are entitled to

First Amendment protection. (*People* v. *Adult World Bookstore* (1980) 108 Cal.App.3d 404, 410-411, fn. 3 [166 Cal.Rptr. 519]; *Barry* v. *City of Oceanside* (1980) 107 Cal.App.3d 257, 261-264 [165 Cal.Rptr. 697]; see *People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42, 58 [130 Cal.Rptr. 328, 550 P.2d 600].)

In *Lewis* v. *Time Inc.*, *supra*, 83 F.R.D. at page 464, the court noted: "Under federal constitutional standards, the right to distribute is carefully protected. In striking down a statute that imposed criminal liability for possession of obscene books by a book store proprietor without the necessity of showing scienter, the Supreme Court explained that the inevitable result of such a law is that the bookseller 'will tend to restrict the books he sells to those he has inspected . . . .[a]nd the bookseller's burden would become the public's burden, for by restricting him, the public's access to reading matter would be restricted.' *Smith* v. *California, supra,* 361 U.S. at 153, 80 S.Ct. at 218-219. It makes no difference that here we deal with civil liability, for 'fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute' *New York Times* v. *Sullivan* [1964] 376 U.S. [254], 277, 84 S.Ct. [710], 724."

 We conclude, therefore, that free speech guarantees of the First Amendment, as well as notions of due process, require that the activities of "adult" bookstores, like EWAP, receive the same protection from civil liability as ordinary bookstores and other distributors which merely disseminate libels produced or published by others. Thus, the rule formulated in section 581 of the Restatement Second of Torts governs this action against EWAP for libel. Accordingly, in order to find the malice or scienter necessary to hold EWAP liable for disseminating the libelous material, a jury would be required to find that EWAP knew or had reason to know of its defamatory character. (Rest. 2d Torts, § 581.) As the court stated in *Lewis* v. *Time Inc.*, *supra*, 83 F.R.D. 455, at page 464: "[A]t the very least, plaintiff must prove the distributors either knew of the libelous content of the article or that facts were known which imposed a duty to investigate."

Our next inquiry is whether Osmond made a sufficient showing in opposing EWAP's motion for summary judgment to meet this standard. EWAP asserts, and we agree, that since unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. (*Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 1116]; *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572].) "Therefore, summary judgment is a favored remedy, and upon such a motion the trial court must determine whether there is a sufficient showing of malice to

warrant submission of that issue to the jury. [Citations.]" (*Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d at p. 685; *Fisher* v. *Larsen* (1982) 138 Cal.App.3d 627, 638 [188 Cal.Rptr. 216].)

In this regard, the Court stated in *Lewis* v. *Time Inc., supra,* 83 F.R.D. 455, at page 465: "The 'failure to dismiss a libel suit,' the *McLaney* court noted regarding publisher liability, 'might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend [First Amendment] principles . . . because of the chilling effect of such litigation.' *Time Inc.* v. *McLaney* [(5th Cir. 1969) 406 F.2d 565,] 566. Because of the special role the distributor plays, it is, if anything, even more critical to dispose of meritless cases at the outset. The requirement of specific allegations of facts concerning actual knowledge or facts giving rise to a duty to investigate protects the distributor from [such] meritless cases . . . . If a distributor can ever bear the burden of liability for libel, such detailed allegations must be required in order to insure the unrestricted distribution of newspapers and magazines which is at the heart of the First Amendment."

■ In the present case, in order to defeat EWAP's motion for summary judgment, Osmond must have raised a triable issue on the question of malice by producing evidence that EWAP knew of the libelous nature of the statement on the film carton or knew of facts which imposed a duty to investigate. (Rest.2d Torts, § 581; *Lewis* v. *Time Inc., supra,* 83 F.R.D. at p. 464.) ■ "Such knowledge cannot be presumed, indeed there is probably a presumption of ignorance. See, e.g. *Howser* v. *Pearson* (D.D.C. 1951) 95 F.Supp. 936." (*Lewis* v. *Time Inc., supra,* 83 F.R.D. at p. 464; see also 6 Cal. Jur. 3d, *supra,* § 187, p. 395, fn. 55.)

■ The declarations of EWAP's president and vice president, which were submitted in support of EWAP's motion, showed that EWAP was the mere distributor of the libelous material and that EWAP lacked knowledge of the libel. Each officer separately averred that he did not see the film carton, did not know who Kenneth Osmond was and did not know who had played the role of "Little Eddie Haskell" on the "Leave it to Beaver" series. Those officers were the only EWAP personnel with authority to order films.

The declarations of EWAP's president and vice president also showed that neither officer was aware of facts which imposed on EWAP a duty to investigate. At the time in question, EWAP had 10,000 to 15,000 films in its inventory and its purchase and sales records did not describe specific films by title, or otherwise.

In opposition to EWAP's motion, Osmond presented evidence that the Le Sex Shoppes displayed the film "Supercock," and offered it for sale to the public. Osmond also presented evidence that his friend, Officer Lane, who knew the statement on the film carton to be false, visited a Le Sex Shoppe store, that Lane noticed the store was selling a film entitled "'Supercock'" which advertised that its star was "'John Holmes, who played "Little Eddie Haskell" on the "Leave it to Beaver" television show,'" that Lane "spoke with the clerk at the store about this" and was informed by the clerk that the store had "other pornographic films of other stars" who also "made pornographic films before going into the movies."

Osmond did not show by the foregoing evidence that EWAP, or even its sales clerk, was ever informed that the libelous statement on the film carton was untrue. Moreover, Osmond's answers to interrogatories propounded by EWAP affirmatively established that Osmond was *not* aware of any statements by EWAP personnel which indicated that EWAP had knowledge of the libel or knew of facts which gave rise to a duty to investigate.

Since Osmond did not present any evidence which makes us suspect that EWAP either had knowledge of the libel or was aware of information which imposed a duty to investigate, he did not make a sufficient showing of malice to justify consideration of the issue by the jury. That is true even though Osmond presented evidence that Le Sex Shoppe also carried pornographic films made by other "stars." That fact standing alone does not suggest that those films were not actually made by the "stars," as represented, nor that it was EWAP's practice to sell films which libeled other celebrities.

Comment (e) to section 581 of the Restatement Second Torts suggests that when a bookstore offers for sale books of a "reputable" author or publishing house, the proprietor is not required to examine the books to discover whether they contain anything of a defamatory character. However, Comment (e) also advises that if a particular author or publisher has frequently published "notoriously sensational or scandalous books," a bookstore offering such literature takes the risk of being held liable for defamations appearing therein.

We do not interpret Comment (e) to condemn all publishers of sexually explicit materials to the category of "sensational or scandalous" publishers. In context, those words describe authors or publishers who notoriously use *defamatory* material in their publications. Accordingly, the word "reputable" in Comment (e) refers to the publisher's reputation for truth and veracity. Since Osmond has presented no evidence which indicates that EWAP bought its films from anything other than a "reputable" producer or pub-

lisher of sexually explicit films, EWAP had no greater duty than any ordinary bookshop owner to examine its wares for libel.

Osmond had the burden of raising a triable issue of fact on the question of malice. (See *Chern* v. *Bank of America, supra,* 15 Cal.3d at p. 873.) He failed to do so. Therefore, EWAP's motion for summary judgment was properly granted by the trial court.

Inasmuch as we have determined that EWAP cannot be held liable for defamation on these facts, we need not discuss the other issues raised by Osmond on appeal.[4]

### DISPOSITION

The judgment, as modified in regard to the third cause of action and as amended to order dismissal of the first and second causes of action, is affirmed in its entirety.

Lui, Acting P. J., and Danielson, J., concurred.

---

[4]Although Osmond stated in his appellant's opening brief that EWAP's motion for summary judgment was granted on the ground that he was a "public figure," the court's order does not reflect its grounds for granting the motion. In any event, if right upon any theory of law applicable to the case, a ruling or decision must be sustained " 'regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)